IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 127,774

STATE OF KANSAS, *Appellee*, v. JONATHAN D. CARR, *Appellant*.

No. 127,850

STATE OF KANSAS, *Appellee*, v. REGINALD D. CARR JR., *Appellant*.

SYLLABUS BY THE COURT

1.

When an appellate court remands a case to the district court, the mandate rule prevents the district court from ruling on an issue that has already been finally settled on appeal. Under this rule, a district court still has authority to address any outstanding issues not resolved on appeal. But this authority is not a license to address new legal issues raised after the mandate has issued.

2.

When a defendant is convicted of a crime based on alternative counts, the alternative counts merge into a single conviction. Once the counts merge, the sentencing court should impose a single sentence for the merged conviction.

3.

The Kansas Supreme Court has statutory authority to notice unassigned errors in the direct appeal of a capital-murder conviction. But this authority does not allow the court to notice unassigned errors after it issues the mandate in the direct appeal.

1

4.

When an appellate court reverses a conviction in a multiple-conviction case, the Kansas Sentencing Guidelines Act contemplates resentencing if the reversed conviction was identified as the primary crime for sentencing purposes.

Appeal from Sedgwick District Court; JEFFREY GOERING, judge. Oral argument held January 28, 2026. Opinion filed June 26, 2026. Affirmed.

*Mark Henricksen*, pro hac vice, of Henricksen & Henricksen Lawyers, Inc., of Oklahoma City, Oklahoma, argued the cause, and *Jason W. Belveal*, of Belveal Law Office, of Holton, was with him on the briefs for appellant Jonathan D. Carr.

*Brian M. Pomerantz*, pro hac vice, of Carrboro, North Carolina, argued the cause, and *Paul R. Oller*, of Kansas Capital Habeas Defender Office, was on the briefs for appellant Reginald D. Carr Jr.

*Boyd K. Isherwood*, deputy district attorney, argued the cause, and *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, were with him on the briefs for appellee.

The opinion of the court was delivered by

WALL, J.: Reginald D. Carr Jr.'s and Jonathan D. Carr's capital murder cases come before this court for a third time. Though they filed separate appeals, we previously consolidated them under Supreme Court Rule 2.06 (2026 Kan. S. Ct. R. at 19).

This third appeal arises from the Carr brothers' pursuit of a new sentencing hearing. The district court denied their request. Reginald and Jonathan Carr now argue that the district court erred because the mandates from their direct appeals failed to resolve several outstanding sentencing issues. We disagree.

The mandates reflect a final appellate judgment affirming their death sentences and leave no unresolved sentencing issues. We thus affirm the district court's order.

2

FACTS AND PROCEDURAL BACKGROUND

In our *R. Carr I* opinion, we recounted the details of the crimes R. Carr and J. Carr perpetrated in Wichita. See *State v. Carr*, 300 Kan. 1, 17-43, 331 P.3d 544 (2014) (*R. Carr I*), *rev'd and remanded sub nom. Kansas v. Carr*, 577 U.S. 108, 136 S. Ct. 633, 193 L. Ed. 2d 535 (2016). The "Carrs' notorious Wichita crime spree culminated in the brutal rape, robbery, kidnapping, and execution-style shooting of five young men and women." Carr, 577 U.S. at 111. The enormity and scale of these crimes resulted in myriad charges under alternative theories of liability. And the capital-murder counts were no exception.

R. Carr and J. Carr carried out execution-style murders of four young men and women—and the attempted murder of a fifth—after forcing the group to participate in sex acts. Based on this conduct, the State charged each brother with eight counts of capital murder for the killing of four victims. As originally charged, the State tied the killing of each victim to two alternative theories of capital murder.

The first capital-murder theory was based on the intentional and premeditated killing of a rape victim—the sex-crime theory. See K.S.A. 21-5401(a)(4) (formerly cited as K.S.A. 21-3439[a][4] [Torrence 2007]). The alternative capital-murder theory was based on the intentional and premeditated killing of more than one person as a part of the same act or transaction—the multiple-murder theory. See K.S.A. 21-5401(a)(6) (formerly cited as K.S.A. 21-3439[a][6] [Torrence 2007]).

The defendants were tried together in both the guilt and penalty phases. The jury found each brother guilty of all eight capital-murder charges. But the eight counts reflected two *alternative* capital-murder theories for each of the four victims. Thus, the district court could impose a sentence on only four capital-murder convictions.

3

So when the trial moved to the penalty phase, the court instructed the jury to decide whether a death sentence was appropriate for each of the four capital-murder convictions—one conviction for each capital-murder victim. The jury recommended a death sentence on all four capital-murder convictions for each defendant. And the district court imposed that sentence.

The defendants appealed directly to our court. See *R. Carr I*, 300 Kan. 1; *State v. Carr*, 300 Kan. 340, 329 P.3d 1195 (2014) (*J. Carr I*), *rev'd and remanded sub nom. Carr*, 577 U.S. 108. Our court reversed seven of each defendant's eight capital-murder convictions. See *R. Carr I*, 300 Kan. at 254; *J. Carr I*, 300 Kan. at 367. It reversed the four capital-murder convictions charged under the sex-crime theory because the jury instructions incorrectly referenced the surviving victim rather than the capital-murder victims. It also reversed three of the four capital-murder convictions charged under the multiple-murder theory because they were multiplicitous. See *R. Carr I*, 300 Kan. at 164; *J. Carr I*, 300 Kan. at 367.

After affirming a single capital conviction, *R. Carr I* and *J. Carr I* turned to the death sentences. The court reversed those sentences after concluding that the Eighth Amendment to the United States Constitution required R. Carr and J. Carr to have separate penalty-phase proceedings. *R. Carr I*, 300 Kan. at 315; *J. Carr I*, 300 Kan. at 371. Given that holding, our court did not address the Carr brothers' remaining penalty-phase issues.

But before the matter was remanded to the district court, the United States Supreme Court granted review. It reversed *R. Carr I* and *J. Carr I* after concluding that the Eighth Amendment did not bar the State from conducting joint penalty-phase proceedings. See *Carr*, 577 U.S. at 126.

4

The Carr brothers made their second appearance in our court on remand from the United States Supreme Court. In *R. Carr II* and *J. Carr II*, we addressed all remaining penalty-phase issues and affirmed each defendant's death sentence for the capital murder of H.M., J.B., B.H., and A.S. See *State v. Carr*, 314 Kan. 615, 730, 502 P.3d 546 (2022) (*R. Carr II*); *State v. Carr*, 314 Kan. 744, 780, 502 P.3d 511 (2022) (*J. Carr II*).

After the mandate issued, both R. Carr and J. Carr filed "Defendant's Motion for Sentencing Hearing." The motions assert—in identical language—that "[t]he *Carr I* holdings—vacating and voiding numerous felony convictions—require a sentencing hearing because a legal sentence for the single capital murder conviction under K.S.A. 21-3439(a)(6) has not been pronounced." Both motions also claim that there was no legal sentence for Count 51—the Linda Ann Walenta felony-murder conviction—because it had been ordered to run "consecutively to counts 1, 3, 5, and 7,"—the capital-murder charges based on the sex-crime theory—which were all vacated in *Carr I*.

The district court held a hearing on the motions and ruled that it lacked jurisdiction to resentence the defendants:

> "Well, it seems to me that, again, what's been troubling me through the arguments this morning and, frankly, as I went through the briefs is that if the Supreme Court had intended that this Court resentence Mr. Jonathan and Reginald Carr on the capital murder conviction, it seems to me that that would have been included clearly in the mandate.
>
> "What we have now is a conviction that has been affirmed by the Supreme Court in both cases, a capital murder sentence that has been affirmed by the Supreme Court in both cases with no direction to the district court to resentence either Jonathan Carr or Reginald Carr on those counts.

"So absent that, I don't think that I have jurisdiction to resentence Mr. Reginald Carr or Jonathan Carr on either case.

"So the motion will be denied."

Both R. Carr and J. Carr appeal the district court's denial of their respective motions for sentencing. They also raise new challenges to their non-capital convictions and sentences for the first time on appeal. We heard oral arguments from the parties on January 28, 2026. And we have jurisdiction because the district court imposed a death sentence. See K.S.A. 21-6619.

ANALYSIS

To fully address the issues raised in this appeal, we divide the opinion into three sections. First, we analyze the scope of the mandates and confirm they left no room to resentence defendants on their capital convictions. Second, we explain why defendants' post-mandate motions are improper vehicles for new legal challenges to their non-capital convictions. Finally, we address J. Carr's illegal-sentence claim and explain why the reversal of several non-capital convictions did not render his sentence illegal.

I. *The mandate rule prevents resentencing on each defendant's capital-murder conviction.*

The central question before us is whether the district court properly dismissed R. Carr's and J. Carr's motions because the mandates left no room to resentence defendants on the sole capital-murder conviction affirmed on appeal. We conclude that it did. To understand why, we first identify the controlling legal standards. Then we define the scope of our mandates and confirm that they foreclosed resentencing.

6

A.  *District courts must follow the mandate of the appellate court.*

By statute, an "appellate court may reverse, affirm or modify the judgment or order appealed from, or may order a new trial in the district court." K.S.A. 22-3605(a).

When an appellate court decision becomes final, the court must transmit to the district-court clerk its mandate, which contains "such directions as are appropriate under the decision." K.S.A. 60-2106(c). A copy of the appellate court's opinion is included with, and constitutes part of, the mandate. "Such mandate and opinion, without further order of the judge, shall thereupon be a part of the judgment of the court if it is determinative of the action, or shall be controlling in the conduct of any further proceedings necessary in the district court." K.S.A. 60-2106(c).

The corollary to K.S.A. 60-2106 is the mandate rule, which "is a statutory imperative that requires lower courts follow the mandates issued by appellate courts." *State v. Cheeks*, 313 Kan. 60, 67, 482 P.3d 1129 (2021); see also K.S.A. 20-108 (appellate court may require district court to "carry the judgment or decree of the appellate court into execution"). The district court "cannot change the mandate, make contrary findings to the ones in the mandate, or further review any issues the mandate finally decided." *Fawcett Trust v. Oil Producers Inc. of Kansas*, 315 Kan. 259, 269-70, 507 P.3d 1124 (2022). And the rule has no recognized exceptions. See 315 Kan. at 269.

The mandate rule prevents district-court action on remand "'when an issue has already been finally settled by earlier proceedings in a case.'" *State v. Smith*, 312 Kan. 876, 884, 482 P.3d 586 (2021) (quoting *State v. Soto*, 310 Kan. 242, 256, 445 P.3d 1161 [2019]). If an issue has been finally settled, "'the district judge is not free to expand upon or revise that history.'" *Smith*, 312 Kan. at 884.

But the rule does not prevent a judge "'from doing whatever else is necessary to dispose of a case,'" including settling other outstanding issues. 312 Kan. at 884. "'Such issues may have been allocated for decision in the district court in the first place and then untouched by appellate proceedings. They may include issues arising from late-breaking facts.'" 312 Kan. at 884. Importantly, the district court's authority to address "outstanding issues" is not a license to address new legal issues raised after the mandate has issued. Cf. *Fawcett Trust*, 315 Kan. at 270 (district court cannot "'unilaterally depart from the mandate, even when a change in the law has occurred'").

While the mandate rule limits a district court's authority, it is not jurisdictional per se. See *Soto*, 310 Kan. at 252 (mandate statutes were designed to enforce hierarchy of Kansas courts, not to set limits on subject matter jurisdiction on remand). But in criminal cases, "[o]nce sentence is pronounced and judgment entered, the district court loses jurisdiction over a criminal case except to correct arithmetic or clerical errors." *State v. Tafoya*, 304 Kan. 663, Syl. ¶ 2, 372 P.3d 1247 (2016). "Thus, on remand from a higher court, absent narrow exceptions, a district court's jurisdiction to resentence or otherwise deviate from an already pronounced sentence is limited to the *express instructions* contained in the higher court's mandate." (Emphasis added.) 304 Kan. 663, Syl. ¶ 3.

Our review is unlimited when we interpret a mandate or decide whether the district court complied with it. *State v. Morningstar*, 299 Kan. 1236, Syl. ¶ 2, 329 P.3d 1093 (2014).

B.   *The mandates left no room for resentencing.*

There is a single mandate for each of R. Carr's and J. Carr's cases. Each mandate incorporates three opinions. For R. Carr, it includes our *R. Carr I* and *R. Carr II* opinions and the United States Supreme Court's *Kansas v. Carr* opinion. For J. Carr, it includes our *J. Carr I* and *J. Carr II* opinions and the *Kansas v. Carr* opinion.

8

R. Carr's and J. Carr's mandates confirm that our court has affirmed a single capital-murder conviction and a single, corresponding death sentence for each defendant. See *R. Carr I*, 300 Kan. at 254 ("we affirm R. Carr's capital murder conviction under Count 2" and "reverse his three remaining capital murder convictions based on the alternative theories under K.S.A. 21-3439[a][4] and [a][6]"); *R. Carr II*, 314 Kan. at 730 ("we affirm Reginald Dexter Carr Jr.'s death sentence for the capital murder of H.M., J.B., B.H., and A.S."); *J. Carr I*, 300 Kan. at 367 (same result as *R. Carr I*); *J. Carr II*, 314 Kan. at 780 (same result as *R. Carr II*). And these mandates are reflected in the appellate history of this case and the relevant appellate holdings.

In *R. Carr I* and *J. Carr I*, our court affirmed one of the eight capital-murder convictions for each defendant. It reversed the four capital-murder convictions charged under the sex-crime theory due to instructional error. *R. Carr I*, 300 Kan. at 161-63. This left four capital-murder convictions charged under the multiple-murder theory. But the State conceded that three of the four convictions were multiplicitous. 300 Kan. at 164.

"[F]or procedure's sake," our court identified Count 2 as the affirmed conviction because it was the first multiple-homicide count in the amended complaint. 300 Kan. at 166. Although the State had named H.M. as the victim in Count 2, our court emphasized that it was the murder of all four victims that elevated the crime to capital murder and made it punishable by death. 300 Kan. at 166.

When our court turned to the penalty-phase issues, it vacated the death sentences after holding that the district court's failure to sever the penalty-phase proceedings violated R. Carr's and J. Carr's Eighth Amendment rights. See 300 Kan. at 315.

9

But the United States Supreme Court granted review and rejected our court's Eighth Amendment holding. *Carr*, 577 U.S. at 125-26. It reversed "[t]he judgments of the Supreme Court of Kansas" and "remanded for further proceedings not inconsistent with this opinion." 577 U.S. at 126.

On remand from the United States Supreme Court, we addressed all remaining penalty-phase and sentencing issues in *R. Carr II* and *J. Carr II*. *R. Carr II*, 314 Kan. at 624; *J. Carr II*, 314 Kan. at 750. We concluded that neither individual error nor the cumulative effect of those errors required reversal of either defendant's death sentence. See *R. Carr II*, 314 Kan. at 730; *J. Carr II*, 314 Kan. at 780. We then made the statutory findings required to affirm a death sentence under Kansas law. Specifically, we concluded that the death sentence had not been imposed under the influence of passion, prejudice, or other arbitrary factors and that the evidence supported the jury's sentence. See K.S.A. 21-6619(c)(1)-(2).

R. Carr's and J. Carr's mandates use identical language to concisely summarize these appellate holdings. The mandates explain that in *R. Carr I* and *J. Carr I*, we "ordered and adjudged . . . that the convictions be affirmed in part, reversed in part, the sentence of death vacated and case remanded." But the United States Supreme Court "reversed the Kansas Supreme Court and remanded for further proceedings." And on remand, we "ordered and adjudged . . . that the death sentence is affirmed" in *R. Carr II* and *J. Carr II*. Finally, the mandates confirm that the United States Supreme Court denied R. Carr's and J. Carr's petitions for writ of certiorari from the *R. Carr II* and *J. Carr II* decisions.

In short, *R. Carr II* and *J. Carr II* affirmed each defendant's death sentence. The decisions resolved all outstanding sentencing issues raised on direct appeal. They didn't remand the matter to the district court. And they contained no explicit instruction for

further proceedings. After *R. Carr II* and *J. Carr II*, there were no outstanding issues left to resolve. And the mandates reflect this conclusion.

This analysis alone confirms that the district court properly dismissed each defendant's motion for sentencing. Despite the clarity of the mandates, R. Carr and J. Carr argue that they left outstanding sentencing issues impacting their capital sentence. We turn to those arguments next. But they do not alter our conclusion.

C. *The defendants' arguments do not establish outstanding issues regarding their death sentences.*

The Carr brothers each argue that their respective mandate is ambiguous or leaves outstanding issues related to their death sentence. They make three arguments to support this conclusion—all based on the belief that their death sentence must be tied narrowly to Count 2 of the amended complaint. First, they claim the district court never pronounced sentence on Count 2. Second, they argue there is no assurance that the jury unanimously imposed a death sentence on Count 2. Finally, they argue the district court failed to make the required statutory findings to impose a death sentence on Count 2.

Before addressing each argument, it's helpful to know how the district court managed the capital-murder counts throughout the trial proceedings.

As noted, the State's amended complaint charged each defendant with eight capital-murder counts. For each victim (H.M., A.S., B.H., and J.B.), the State charged two alternative capital-murder theories—the sex-crime theory and the multiple-murder theory. See K.S.A. 21-5401(a)(4); K.S.A. 21-5401(a)(6). The capital-murder charges based on the sex-crime theory were set out in Counts 1, 3, 5, and 7. The capital-murder charges based on the multiple-murder theory were set out in Counts 2, 4, 6, and 8.

11

Rather than submitting eight separate counts to the jury, the guilt-phase jury instructions and verdict forms consolidated the alternative capital-murder theories into a single count. The instructions included four capital-murder counts—one for each victim. And each of those four counts contained an "A" and "B" alternative. The "A" alternative described the State's sex-crime capital-murder theory, and the "B" alternative described the State's multiple-murder theory for a particular victim. The guilt-phase verdict forms adopted the same approach. And the jury found R. Carr and J. Carr guilty of the capital murder of each victim under both the "A" and "B" alternatives.

During the penalty phase, each brother's four capital-murder convictions were organized by victim and did not make any distinction between the "A" and "B" alternatives. And the jury sentenced the defendants to death on all four convictions.

1. *The district court lawfully pronounced a death sentence on the capital-murder conviction.*

The defendants first argue that the district court never pronounced a sentence for Count 2—the capital murder of H.M. under the multiple-murder theory. At sentencing, the district court pronounced J. Carr's sentence on the capital counts, stating "[i]n counts one, three, five, and seven your sentence is that you be put to death." The district court used nearly identical language to sentence R. Carr. And the district court made no specific pronouncement on Counts 2, 4, 6, and 8.

In *R. Carr I* and *J. Carr I*, our court identified Count 2 (for ease of reference and procedural purposes only) as the sole capital-murder conviction affirmed on appeal. Because the district court did not pronounce a sentence on Count 2 specifically, the defendants believe that they were not sentenced to death (or any other punishment) on that count. We disagree because the argument fails to account for the merger doctrine's impact on these proceedings.

12

We discussed the merger doctrine in *State v. Vargas*, 313 Kan. 866, 873-75, 492 P.3d 412 (2021). There, we explained that convictions on alternative counts must merge into a single conviction because the "very *fact* of a conviction . . . is punishment—even without a concomitant sentence." 313 Kan. at 872-73. This is an extension of our long-standing principle that "'two first degree murder convictions and sentences stemming from one homicide constitute double punishment and cannot be allowed to stand.'" 313 Kan. at 871 (quoting *State v. Sullivan*, 224 Kan. 110, 112, 578 P.2d 1108 [1978], *disapproved of on other grounds by State v. Berry*, 292 Kan. 493, 254 P.3d 1276 [2011]).

The doctrine applies to convictions and sentences only. It does not bar the State from charging or presenting the jury with alternative theories of liability for the same crime. *Vargas*, 313 Kan. at 872. But if a jury ultimately convicts on both counts (both theories of liability), "the verdict on [the second count] should merge by operation of law with the verdict on [the first count] and result in one conviction." 313 Kan. at 873.

Once the counts merge, the sentencing judge should impose a single sentence for the merged conviction. See 313 Kan. at 875. The journal entry should also identify a single conviction and sentence. But it can also identify both alternative theories supporting that conviction—e.g., "count 1, or in the alternative count 2." This is precisely what the sentencing judge did here.

The Journal Entry of Judgment for each defendant memorializes four capital convictions—one for each capital-murder victim—each resulting in a death sentence. Each of the four counts lists the "CAPITAL Offense of Conviction" as "CAPITAL MURDER." It then notes the counts that apply to that offense of conviction: e.g., "Count No. 1 or, in the alternative, Count No. 2." For each capital conviction, the odd numbered count is always the first listed, and the even numbered count is the "alternative" count.

13

The journal entry's section for "K.S.A. Number" lists both K.S.A. 21-3439(a)(4), the sex-crime theory, and K.S.A. 21-3439(a)(6), the multiple-murder theory, for each of the four capital-murder convictions.

This provides meaningful context for the district court's sentencing pronouncement. The district court imposed four death sentences for each of the four capital-murder convictions. By denoting Counts 1, 3, 5, and 7, the judge did not omit the even-numbered counts because he forgot to pronounce sentence on them. He referenced Counts 1, 3, 5, and 7 specifically because the even-numbered counts had merged by operation of law into their odd-numbered counterpart.

The merger doctrine clarifies that there is no meaningful distinction between Count 1 and Count 2. Both had merged into a single capital-murder conviction for sentencing purposes. And any sentence pronounced on Count 1 also controlled the count merged into it—Count 2. Even if the merger doctrine's impact on the defendants' sentences was implicit at the time of pronouncement, it became explicit in the journal entries of judgment. Cf. *State v. Juiliano*, 315 Kan. 76, 78-84, 504 P.3d 399 (2022) (court will review context of entire sentencing hearing, not just focus on single portion or statement).

Thus, the district court pronounced a sentence of death for each defendant on the capital-murder conviction that our court affirmed on direct appeal.

2. *Defendants' unanimity argument does not show any unresolved issues in the mandates.*

Applying a similar rationale, the defendants also argue that we cannot know whether the jury unanimously agreed to impose the death penalty for Count 2 because the district court did not carry forward the capital-murder liability theories in the penalty-

14

phase instructions and verdict forms. The argument rests on a faulty premise—that the jury's sentencing decision was tied to the capital-murder theories specifically.

The charged capital-murder theory is certainly relevant in the guilt-phase. For example, the elements of the sex-crime theory of capital murder differ slightly from the multiple-murder theory. So when the State charges both theories in separate counts, it must prove every element of each capital-murder theory.

But the jury's focus shifts from the elements of the offense to aggravating and mitigating circumstances in the penalty phase. The jury may impose a death sentence only if it unanimously finds "beyond a reasonable doubt that one or more of the aggravating circumstances enumerated in K.S.A. 21-6624 . . . exist and, further, that the existence of such aggravating circumstances is not outweighed by any mitigating circumstances which are found to exist." K.S.A. 21-6617(e). And mitigating and aggravating circumstances are not tied to, or dependent on, the capital-murder theory supporting defendant's conviction.

Mitigating circumstances typically focus on the individual defendant, not the capital-murder theory. See K.S.A. 21-6625. They include circumstances that "lessen or diminish the moral culpability or blame of defendant or otherwise warrant a life sentence." *State v. Robinson*, 303 Kan. 11, 190-91, 363 P.3d 875 (2015), *disapproved on other grounds in State v. Cheever*, 306 Kan. 760, 402 P.3d 1126 (2017).

Statutory aggravating circumstances largely focus on how a defendant committed the crime. Kansas law recognizes only eight aggravating circumstances. See K.S.A. 21-6624. Granted, some aggravating circumstances overlap with elements of certain capital-murder theories. Compare K.S.A. 21-6624(b) (aggravating circumstance: defendant killed, created great risk of death to more than one person) with K.S.A. 21-5401(a)(6) (crime of capital murder is intentional and premeditated killing of more than one person

15

in same act, transaction). But the State can rely on any, or all eight, aggravating circumstances in K.S.A. 21-6624 no matter which capital-murder theory supported defendant's conviction. The evidence must simply support them. In other words, none of the aggravating circumstances are limited to specific capital-murder theories as a matter of law.

This case illustrates the point. The State alleged the existence of four aggravating circumstances: (1) defendant killed more than one person; (2) defendant committed the crime to receive monetary value; (3) defendant committed the crime to avoid arrest or prosecution; and (4) defendant committed the crime in an especially heinous, atrocious, or cruel manner. The jury was free to consider all four aggravating circumstances, whether defendants had been convicted of only the sex-crime theory, the multiple-murder theory, or both. The State's aggravated circumstances applied equally to both the sex-crime and multiple-murder theories of conviction.

Thus, there is no concern about juror unanimity in the penalty phase. And defendants' argument fails to show that the mandates left any unresolved issues.

3. *The district court made the statutorily required findings for a death sentence.*

Finally, focusing on Count 2 specifically, the defendants argue that the district court failed to make the findings required by statute for that count.

Before pronouncing sentence in a death-penalty case, K.S.A. 21-6617(f) requires the district court "review any jury verdict imposing a sentence of death hereunder to ascertain whether the imposition of such sentence is supported by the evidence." K.S.A. 21-6617(f) (formerly cited as K.S.A. 21-4624). At sentencing, the district court made this

16

statutory finding, announcing "[I have] reviewed the jury's verdict imposing a sentence of death against both defendants and I find that such sentence is supported by the evidence. I'll accept the verdict, enter judgment accordingly."

The defendants argue that this finding was not specific to any counts in the amended complaint. They believe that the finding needed to reference Count 2 specifically because that was the count this court affirmed in *R. Carr I* and *J. Carr I*. And because the district court later pronounced a death sentence on the odd-numbered capital counts only—Counts 1, 3, 5, and 7—defendants believe the district court's finding applied only to those counts. The argument fails to withstand scrutiny.

First, nothing in the statute suggests that the district court's statutory finding needs to be count-specific. And the district court's blanket finding suggests it applied to all capital counts of conviction.

Second, in *R. Carr I* and *J. Carr I*, the court identified Count 2 as the conviction upheld only "for procedure's sake." *R. Carr I*, 300 Kan. at 166. It referenced that count simply because it was the first multiple-murder theory charged in the amended complaint. 300 Kan. at 166. But our court emphasized that it was affirming the "capital conviction for the murder of all four of the victims." 300 Kan. at 166.

More importantly, once the jury found each defendant guilty of the capital murder of H.M. under each alternative capital-murder theory—Count 1 and Count 2—those two counts merged into a single capital-murder conviction by operation of law. And each alternative theory independently supported that single capital-murder conviction. So any finding on Counts 1, 3, 5, and 7 applied equally to Counts 2, 4, 6, and 8.

Thus, the district court complied with K.S.A. 21-6617(f). And *R. Carr I*'s and *J. Carr I*'s reference to Count 2 did not create unresolved issues for the district court to

17

address. This conclusion is reinforced by *R. Carr II* and *J. Carr II*, where we affirmed the death sentence for each defendant after finding that sentence was supported by the evidence and was not "'imposed under the influence of passion, prejudice or any other arbitrary factor.'" *R. Carr II*, 314 Kan. at 730.

In sum, the mandate in each defendant's case reflected a final judgment affirming each defendant's death sentence. It did not remand for further proceedings or leave unresolved capital-sentencing issues for the district court.

II. *Defendant's newly raised, unpreserved claims of sentencing error on the non-capital counts cannot evade the mandate rule.*

Defendants' sentencing motions did not challenge only the mandate rule's application to the capital sentences. They also raised new claims of sentencing error on the non-capital convictions.

First, defendants argue that the district court abused its discretion by ordering certain convictions to run consecutive to others because some of those convictions were overturned on appeal. Second, defendants also argue that the court must reverse their conviction for Count 51—the felony murder of Walenta—because it is multiplicitous to their capital-murder conviction.

Defendants first raised these issues after their direct appeals were final and the mandates had issued. Appellate courts generally do not entertain arguments raised for the first time on appeal—let alone post-mandate. And the mandate rule prevents district courts from addressing issues resolved on direct appeal.

Recognizing these limits, defendants argue that our court has statutory authority to review these arguments as unassigned error under K.S.A. 21-6619 and as illegal-sentence

18

claims under K.S.A. 22-3504. We address each statutory basis in order and conclude that neither authorizes the court to consider defendants' new legal claims.

A. *Our court cannot review the new arguments as unassigned errors.*

K.S.A. 21-6619 governs direct appeals from convictions resulting in a death sentence. The statute includes four subsections that outline the forum, procedure, and scope of appellate review:

"(a) *A judgment of conviction resulting in a sentence of death shall be subject to automatic review by and appeal to the supreme court of Kansas in the manner provided by the applicable statutes and rules of the supreme court governing appellate procedure.* The review and appeal shall be expedited in every manner consistent with the proper presentation thereof and given priority pursuant to the statutes and rules of the supreme court governing appellate procedure.

"(b) *The supreme court of Kansas* shall consider the question of sentence as well as any errors asserted in the review and appeal and *shall be authorized to notice unassigned errors appearing of record if the ends of justice would be served thereby*.

"(c) With regard to the sentence, the court shall determine:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; and

(2) whether the evidence supports the findings that an aggravating circumstance or circumstances existed and that any mitigating circumstances were insufficient to outweigh the aggravating circumstances.

"(d) The court shall be authorized to enter such orders as are necessary to effect a proper and complete disposition of the review and appeal." (Emphases added.)

19

Subsection (a) provides that defendants can appeal a judgment of conviction resulting in a death sentence directly to our court. During that review, subsection (b) requires our court to consider the sentence and address errors asserted on appeal. It also authorizes our court to consider "unassigned errors" in the record, if doing so would serve the ends of justice.

But subsection (b) is not unlimited. The Legislature's grant of authority to notice unassigned errors is limited to the mandatory review of a capital-murder conviction and death sentence on direct appeal. Nothing in the statute's plain language suggests that the court's authority to address unassigned error continues after a "proper and complete disposition of the review and appeal." K.S.A. 21-6619(d).

To the contrary, K.S.A. 21-6619(a) makes clear that the direct appeal of a death sentence is subject to the "applicable statutes and rules of the supreme court governing appellate procedure." And we have consistently held that the statutory authority to notice unassigned errors cannot be used by an appellant to justify "an end run around our rules of appellate procedure." *Cheever*, 306 Kan. at 774.

Under those rules, an appellate judgment is final when the mandate is issued. See *State v. Showalter*, 319 Kan. 147, 173, 553 P.3d 276 (2024). And here, once we issued our mandates, the judgment affirming the conviction and sentence for R. Carr's and J. Carr's capital-murder convictions was final. This ended the mandatory review of their death sentences—and with it, this court's authority to address unassigned errors.

B.  *The illegal-sentence statute does not permit the courts to review defendants' new issues.*

K.S.A. 22-3504(a) permits a court to correct an illegal sentence at any time while the defendant is serving the sentence. But the statute narrowly defines what constitutes an

illegal sentence. See *State v. Brown*, 320 Kan. 426, 429-30, 569 P.3d 909 (2025). An illegal sentence is one that's "[i]mposed by a court without jurisdiction," "does not conform to the applicable statutory provision, either in character or punishment," or "is ambiguous with respect to the time and manner in which it is to be served at the time it is pronounced." K.S.A. 22-3504(c)(1). "Attacks on the constitutionality of the sentencing statutes or the sentencing procedure do not equate to a failure to conform to the statute and do not meet the definition of an illegal sentence." 320 Kan. at 430.

The defendants' new claims fall outside the scope of the illegal-sentence statute. Defendants first argue that the district court abused its discretion by imposing consecutive sentences. But that claim is not based on the judge's failure to conform to any applicable statutory provision (or any other definition of an illegal sentence). Indeed, the district court had discretion to impose concurrent or consecutive sentences in their multi-conviction cases. See K.S.A. 21-4720(b)(2) (Torrence 2007). And defendants' multiplicity challenge to the felony-murder conviction—Count 51—is grounded in constitutional doctrine and falls outside the illegal-sentence statute. See *State v. Sims*, 294 Kan. 821, Syl. ¶ 4, 280 P.3d 780 (2012) (multiplicity challenge falls outside the statutory definition of an illegal sentence).

Because defendants' new claims fall outside the scope of K.S.A. 21-6619 and the illegal-sentence statute, the courts lack authority to address them.

III. *J. Carr's illegal-sentence claim based on the district court's lack of subject-matter jurisdiction had no impact on his controlling sentence.*

J. Carr argues that his non-capital sentence is illegal because several convictions were dismissed for lack of subject-matter jurisdiction. And he believes this affected the district court's sentencing on the remaining non-capital counts affirmed on appeal.

Indeed, *J. Carr I* reversed defendant's convictions on Counts 25, 26, and 29-40 because they failed to charge crimes under Kansas law. 300 Kan. at 367. Even if the district court lacked jurisdiction to sentence J. Carr on those counts, those sentences did not render his sentence illegal under the Kansas Sentencing Guidelines Act (KSGA). In short, the reversal of these convictions had no impact on the sentence. To understand why, we look to the statute controlling sentencing in multiple-conviction cases, which remains the same now as it was when R. Carr and J. Carr were sentenced. Compare K.S.A. 21-4720 (Torrence 2007) with K.S.A. 21-6819.

The sentencing process in multiple-conviction cases has two fundamental components—designating the base sentence and applying criminal history. To calculate the base sentence, the court first identifies a primary crime—the on-grid crime with the highest severity level. Then it applies defendant's full criminal-history score to calculate defendant's sentence on the primary crime. K.S.A. 21-4720(b)(3) (Torrence 2007). That sentence is the base sentence. While the court calculates a sentence for the other crimes of conviction, it does not apply defendant's full criminal-history score to those non-base sentences. K.S.A. 21-4720(b)(5) (Torrence 2007). And a defendant's total sentence for convictions arising from multiple counts cannot exceed twice the base sentence. K.S.A. 21-4720(b)(4) (Torrence 2007). So the base sentence serves as the foundation for the defendant's sentence in a multiple-conviction case.

If the primary crime is reversed on direct appeal, then that foundation disappears because all remaining convictions were originally non-base sentences without an assigned criminal history score. In that situation, the statute requires remand for resentencing and the sentencing process begins anew—identifying a new primary crime and calculating a new base sentence. See K.S.A. 21-4720(b)(5) (Torrence 2007).

But J. Carr's primary crime was affirmed on appeal—Count 9, the attempted murder of H.G. And his sentence was capped at twice the base sentence based solely on the sentences imposed for the non-primary convictions affirmed on appeal. In short, the reversal of Counts 25, 26, and 29-40 had no impact on his KSGA sentence.

Nor did it impact his off-grid sentences. In multiple-conviction cases, the sentencing court has discretion to run the sentences consecutive or concurrent. K.S.A. 21-4608(a) (Torrence 2007). When, as here, the judge orders the sentences for on-grid convictions to run consecutive to off-grid convictions, defendant must serve the on-grid sentences after completing the off-grid sentences. K.S.A. 21-4720(b)(2) (Torrence 2007). So the reversal of on-grid convictions doesn't impact a defendant's off-grid sentences.

J. Carr has failed to show that the reversal of Counts 25, 26, and 29-40 caused him injury or otherwise resulted in an illegal sentence. And he is not entitled to resentencing.

CONCLUSION

Each defendant's mandate reflected a final appellate judgment affirming their death sentence. The mandates did not remand the matters or instruct the district court to conduct further proceedings. And defendants have failed to demonstrate that the mandates left any outstanding capital-sentencing issues for the district court. Also, defendants' motions are not proper vehicles for raising new challenges to their non-capital convictions. Finally, J. Carr fails to show that the reversal of Counts 25, 26, and 29-40 rendered his sentence illegal under the KSGA. We thus affirm the district court's dismissal of R. Carr's and J. Carr's post-mandate motions for sentencing.

Affirmed.

LUCKERT, J., not participating.

23